## SETH STONE v. STATE.

No. A-9033. Sept. 18, 1936.
(61 Pac. [2d] 41.)

Glen Morris and Joe Adwon, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error was by information jointly charged with Perry W. Morton, tried separately, convicted, and sentenced to serve a term of two and one-half years in the state penitentiary. Motion for new trial was filed, considered, overruled, and the plaintiff in error has appealed. The plaintiff in error hereinafter in this opinion will be referred to as the defendant.

The charge against the defendant is that he received one $100, 4½ per cent. Liberty Loan Bond, No. 552860, of the value of $100, knowing the same to have been stolen from the Farmers National Bank, of Lincoln, Kan., which

bond it is alleged was the personal property of Mrs. Sarah E. Hayden.

The testimony on behalf of the state shows that Mrs. Sarah E. Hayden had delivered the $100, 4½ per cent. Liberty Loan Bond, No. 552860, to the Farmers National Bank, of Lincoln, Kan., for safekeeping, the bank becoming the custodian for Mrs. Hayden. The testimony further shows that this bond, together with several others, was stolen from the bank.

The state called Perry W. Morton, who testified in substance:

"I am one of the defendants in this case; I am an attorney at law, practicing in Oklahoma City, have been in Oklahoma City about five years; my office is on the eighth floor of the Ramsey Tower. During the month of April, 1933, Seth Stone was introduced to me by a man named Duncan; the defendant Stone stated to me his brother had been convicted in the district court of Shawnee and sentenced to 10 years; defendant Stone said he had some Liberty bonds, but he did not have any money, and I said, 'All right, I had just as soon have Liberty bonds as money.' After some discussion he said, 'But they are hot;' he said they had been stolen in Kansas, or some place other than Oklahoma. I think it was the next day he came back to my office and brought a $100 bond. State Exhibit 1 is the bond that Seth Stone brought to me at my office.

"After the bond was delivered to me, I let John Adams, and another man by the name of Hooper, I think he was a private detective, and a man by the name of Guy Zingerly, have the bond, which was afterwards returned to me. I saw Seth Stone later in my car in front of the house in which he lived on West Twenty-Fourth Street. I had a conversation with him in the presence of Mr. Zingerly, in which conversation Stone said he could deliver a large number of bonds worth something like

30 some thousand or 50 some thousand. We talked about the sale of these bonds, and the defendant Seth Stone said he would have to get better than 11 cents on the dollar for the bonds; he also said he would have to have some $25 in money; that he would have to wire some man, I think he said in Joplin, Mo., the money to be used to pay the expenses of this man to Oklahoma City; that this fellow had been down a time or two to help him sell the bonds and that he would not return unless we furnished him with expense money. We did not furnish the money, and he said he guessed he would do that. I do not know whether he did or not.

"The next time I saw the defendant was about the 13th of April. Zingerly and I had gone to the room in the hotel and talked with a man who was introduced as a Mr. Wilson, as a booster. This man Wilson said he would buy the bonds and pay 16 cents on the dollar. I called Stone's residence and told him Wilson wanted to buy the bonds and told him he would pay 16 cents, and he said, 'you had better drive out.' I think that was all that was said in the conversation. I went out and talked with him and gave him Wilson's room number at the hotel; I told him Wilson wanted him to bring all the bonds he had or could get at one trip, he wanted to leave town. Stone said, 'No, I won't do that, I will take one of them,' and, if everything was all right, he would bring the balance of them. 'You fellows go and wait for me in the lobby of the Skirvin Hotel.' Stone said he had the bonds.

"I did not see Stone again until after he was arrested and I was in custody. This bond, State Exhibit 1, at the time of my visit to Stone, and all of this conversation, was in the drawer of my desk in my office in the Ramsey Tower. After we were arrested, a federal employee named Cooley took me up to my office and I got it out of the desk and handed it to him. At the time I was talking to Wilson about the bonds in the hotel I did not know he was a federal officer."

On cross-examination this witness stated, when he talked to John Adams and gave him the bond, he knew Adams was a deputy sheriff.

"I gave Adams the bond before I talked with Wilson; I was helping this man to sell the bonds; I did not know Wilson was an officer; I came from Eldorado, Ark., to Oklahoma City. There were a number of men who had offices in the same suite of rooms in which I was officing. Duncan left immediately after introducing me to Mr. Stone. Before leaving, Duncan said, 'Stone, this is the man I was talking with you about,' and told me who he was. I did not go into his brother's case; I talked to him as an individual, and he told me he could not pay me except in hot Liberty bonds. He had not submitted any bond to me at that time; he gave me the bond on his second visit to the office. State Exhibit 1 is the bond he delivered to me in my office. I never gave Seth Stone any money. I learned Mr. Zingerly was dead through a friend of mine. I never heard of a man by the name of Wagner until I saw in the paper a few months after this where he had been arrested in California when alighting from an aeroplane.

"I received this bond, which is State Exhibit 1, from Stone about the 5th or 6th of April, 1933. I called the defendant from the Skirvin Hotel and had a conversation with him on the 13th day of April, 1933, and then drove out to his house; I asked him if he had the bonds, the defendant wanted to know if we wanted all of them, and said, 'Yes, I have them,' and fingered with some papers in his pocket; I don't know whether they were bonds or not—I would not say they looked like bonds. I was not present at the hotel room when Seth Stone came in; I was only in the room once. Zingerly and I were to meet Seth Stone in the lobby. We were expecting him when the officers arrested us. I did not see Stone at the hotel."

G. B. Wilson stated:

"I am an Operative U. S. Secret Service man. On the 12th and 13th of April, 1933, I was temporarily as-

signed to Oklahoma City, for general assignment purposes. I have seen State Exhibit No. 1 before. Guy Zingerly brought this bond to our office and submitted it to Operative Cooley and myself. The bond was returned to Zingerly on or about the 9th of April, 1933. On April 13, 1933, I was introduced to Mr. Perry Morton, in room 818, Skirvin Hotel. Morton stated he was in a position to supply me with an unlimited number of those Liberty bonds. We agreed upon a price of 16 cents on the dollar. Mr. Morton made a phone call while in the room. I heard Mr. Morton say, 'Is that you, Seth?' and Mr. Morton says, 'We will be out.' An hour or so thereafter there was a rap on my door and I answered the rap, and the defendant Seth Stone was standing there; he said, 'I guess you know who I am,' and I says, 'I never saw you before.' Stone stated a fellow by the name of Morton talked with me from here a while ago, and said, 'I guess you know what it is all about.' I said, 'Now let's get down to business, how about those bonds'; he says, 'What do you want; how much will you give'; I told him I wanted all he could deliver. We discussed the price, and I asked him if he brought the bonds with him, and he said, 'Yes,' and I said, 'Let's see them,' and he said, 'Let's wait until Morton gets here,' and I replied, 'All right.'

"Before Morton and Zingerly returned to my room, Operative Cooley and some other officers came and placed Seth Stone under arrest. There was nothing further said about the bonds. I was to pay 16 cents on the dollar. I understood that Perry Morton was in on the deal."

State Exhibit 3 was handed to the witness and asked where it came from, and he replied:

"From the inside pocket of Seth Stone, in room 818, Skirvin Hotel, on April 13, 1933. At the time Seth Stone was arrested, Guy Zingerly and Perry Morton, Seth Stone's brother Fred or Emery, I think, were arrested. In our office after being questioned, Morton and Zingerly made a statement; Seth Stone was asked to make one and refused to make a written statement or any statement."

On cross-examination witness stated the defendant, Stone, was not present in his room at the time of the alleged telephone conversation by Morton to some one on the outside. Witness further stated that the word "appeal" was not used in the telephone conversation by Morton.

"Mr. Stone was searched in my presence and there was no bond found on his person at any time. This particular bond, State Exhibit 1, was taken from Perry Morton's office, or surrendered to the officers when they took Morton to his office while he was under arrest. Mr. Zingerly is dead; died in December, '34."

The state then asked permission to read what it termed State Exhibit 3, Receipt on Telegraph Money:

"Oklahoma City, Oklahoma. Received from S. W. Stone, $15.00, to be paid to E. S. Wagner, at Joplin, Missouri. Dated April 12, 1933. 94c paid."

The state called Robert A. Baker as a witness; he stated he was an operative United States secret service man.

"In April I saw the defendant, Seth Stone; this receipt was taken from the defendant, Seth Stone, in our office, and it has been in my possession until it was surrendered to operative Cooley; I saw it initialed."

Perry Morton was recalled and stated he was in the lobby of the hotel at the time he was arrested.

"I did not leave voluntarily but was taken that day to the city jail. I was taken to my office the next day where I delivered the bond. I took it out of a drawer of my desk and handed it to the federal officers after they brought me from the city jail to my office. I delivered the bond to them on the 14th day of April, 1933."

G. B. Wilson was recalled by the state and testified he remembered the apprehension of E. S. Wagner, in Los

Angeles, Cal.; he had possession of $35,000 in Liberty bonds; they were part of the loot taken from the bank in Kansas. He further stated that the bond in question in this case could be cashed only by the party to whom it was made out, as it had not been assigned or endorsed by Mrs. Hayden. The foregoing is the substance of the testimony introduced by the state.

When the state closed its testimony, "the defendant rested, and demurred to the evidence of the state on the ground that the state had wholly failed to prove possession, of any stolen property or bond, or that the bond introduced in this case was taken from the bank in Kansas, and has failed to produce evidence enough to sustain a cause of action as charged in the information, and for the reason further that all of the evidence and testimony introduced is not sufficiently corroborated to go to the jury," which demurrer was overruled and exceptions duly saved. The defendant then moved for a directed verdict, which motion was overruled and exceptions saved.

The information in this case specifically charged the defendant and other parties with having possession of one $100, 4½ per cent. Liberty Loan bond, No. 552860, of the value of $100, knowing this Liberty bond was stolen. The testimony of the state shows that the bond described in the information and introduced in evidence was stolen from the Farmers National Bank, at Lincoln, Kan. Perry W. Morton is the only witness testifying in the case that the defendant had possession of the bonds he is charged with having, knowing the same to have been stolen. The defendant in his argument discusses at length the question that Morton was an accomplice, and therefore his testimony is not corroborated. This argument of the defendant is largely upon the ground that the court in its instruction told the jury, as a matter of law, that Perry

W. Morton was an accomplice of the defendant, Seth Stone. We think that the evidence fails to show the witness Perry W. Morton to be an accomplice, and the instruction of the court that he was an accomplice was an error in favor of the defendant. The instruction of the court is as favorable to the defendant as the facts in the record justify.

Ballentine, in his Law Dictionary, defines an accomplice as being a person so connected with a crime that at common law he might himself have been convicted either as principal or as an accessory before the fact. An accomplice may be one of the principal actors or an aider or abettor, or an accessory before the fact, and includes all persons who participated whether as principals, aiders and abettors, or accessories before the fact.

The testimony is clear that the defendant in this case was accompanied to the office of Perry W. Morton by a man by the name of Duncan, and was introduced to Morton, had a conversation with Morton as to a case of his brother who was in jail at Shawnee; that he told witness Morton the time he was introduced to him he did not have any money to pay him for looking after his brother's case, but he had some bonds that were hot, and he returned the next day and brought with him the bond in question in this case. Under this testimony Morton could not be an accomplice in receiving the bond, knowing it to have been stolen, as it had already been received by the defendant and taken to the office of Morton.

The testimony of Morton is not denied by the defendant or by any one testifying for him, and it is therefore undisputed that the bond had been received by the defendant before he met the witness Morton. If Morton could be charged with any crime, he might be charged

with accessory after the fact. The testimony further discloses that when Stone was arrested he had in his pocket what purported to be a receipt for $15 to be sent to E. S. Wagner, at Joplin, Mo. The receipt was not signed by any one, and was introduced for the purpose of trying to connect the defendant with E. S. Wagner, who was later arrested as he alighted from an aeroplane, in the state of California, and had in his possession about $35,000 in Liberty bonds stolen from the bank in Kansas at the time the bond in question in this case was stolen.

The rule repeatedly announced by this court is that it will not reverse a judgment of conviction upon the ground that the verdict is not supported by the evidence, unless there is no substantial evidence tending to show the guilt of the defendant, or the evidence fails so far to support the verdict that the necessary inference is that the jury had acted from partiality, passion, or prejudice. Underwood v. State, 36 Okla. Cr. 21, 251 Pac. 507.

The punishment imposed clearly indicates that it was not the result of passion or prejudice. Considering all the evidence in the case and circumstances surrounding the action of the defendant, as disclosed by the record, we hold that Perry W. Morton was not an accomplice of Seth Stone; that the defendant Seth Stone was accorded a fair and impartial trial. The evidence is sufficient to sustain the judgment.

No errors appearing in the record, the judgment is affirmed.

EDWARDS, P. J., and DOYLE, J., concur.